# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

UNITED STATES OF AMERICA

Plaintiff,

v.

UMIDJON SHUHRAT UGLI NEMATOV

Defendant

**DECLARATION OF JEFFERY G. VANNETT**

I, Jeffery G. Vannett, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1. I am currently employed as an Acting Assistant Field Office Director (AAFOD) with the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I have held this position since February 2024. I am assigned to the Montgomery Processing Center (MPC), located in Conroe, Texas. At the MPC, I manage ERO personnel and provide oversight of ICE operations in the facility. I have been employed by ICE ERO since February 2007.

2. As an AAFOD, I am responsible for the supervision and oversight of ERO operations, including detention and removal of noncitizens, at the MPC.

3. ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of all persons detained in its custody are among

the agency's highest priorities, and ICE has protocols in place to ensure that any individual on a hunger strike within its detention facilities is promptly and appropriately addressed and treated, and that the safety, security, and order of the facility is maintained for the detainees, staff, contractors, volunteers, and visitors therein.

4. Umidjon Shuhrat Ugli Nematov, A# XXX XXX 786 (the Defendant) is a citizen of Uzbekistan and is presently detained at the MPC under the immigration laws. He has been detained at the MPC since March 27, 2024. Prior to that, he was detained at the River Correctional Center (RCC), in Ferriday, Louisiana from August 19, 2023, through March 27, 2024, where he officially began his hunger strike, before being transferred to the MPC for higher level medical care.

5. As of March 5, 2024, the Defendant had missed nine (9) consecutive meals and was officially listed as being on a hunger strike by on-site medical personnel. The Defendant's stated intent in engaging in a hunger strike is that he wants to be released from ICE custody.

6. Since the Defendant began his hunger strike, the RCC staff attempted to convince him to end the hunger strike and begin eating food. It has been explained to the Defendant that, if he continues the hunger strike, his health will be seriously jeopardized, and he may eventually die. Despite repeated efforts to convince him to eat, the Defendant has failed to cooperate and demonstrated his commitment to continue the hunger strike.

7. Upon arrival to the MPC, medical personnel have informed the Defendant that if he continues his hunger strike it may become necessary to seek a court order to involuntarily administer food and/or hydration to save his life.

8. In addition to ICE's paramount concerns about the health and wellbeing of ICE detainees, the death or injury of any detainee as a result of a hunger strike would also seriously

affect the operations of ICE at the MPC and adversely affect ICE efforts to maintain the safety, security, and good order of the detention facility for the detainees, staff, contractors, volunteers, and visitors therein in the following ways:

a. My foremost obligation is to maintain the safety and security of the ICE detainees housed at the facility and provide for the health and well-being of the detainees, which includes protection from self-harm. A facility cannot stand by and fail to intervene in self-injurious behavior that is completely antithetical to our mission of maintaining the health and safety of noncitizens under our care.

b. Moreover, other detainees may engage in hunger strikes, whether or not with the intention of committing suicide by starving themselves to death. For a detainee to cause his own death without staff intervention would completely undermine DHS's obligation to render appropriate medical care and prevent detainee suicides.

c. In addition to critical personal health and safety for each individual, general security and order in the facility can also be destabilized by hunger strikes, which risks harm to other persons in the facility, including detainees, staff, contractors, volunteers, and visitors. Perceptions may be formed by the ICE detained population that ICE will simply let a detainee die, without intervening to save him or her, which could lead to lowered morale, resentment, acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the facility. I am concerned that hunger strikes, and even other acts of a disruptive or violent nature, would be directed at staff and other providers, to express detainee anger, resentment, and frustration.

d. If such disruptive acts were to occur, tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

e. Other detainees may decide that they have lost confidence in the skills, ability, or willingness of medical staff at the facility to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

f. Detainees who participate in hunger strikes may severely and permanently damage their health. This may also require immediate and long-term medical care which in turn may require DHS to unnecessarily divert and expend its limited resources when such action can be avoided with appropriate medical intervention.

g. In the absence of an adequate response to life-threatening hunger strikes, other detainees may participate in such activities in an attempt to change facility operations or exact concessions from facility management, rather than using other available means that do not threaten their health and wellbeing. For example, Detainees may initiate hunger strikes to pressure staff to transfer them away from the facility, or to gain their release from detention. Without the ability to intervene when medically necessary, the facility will be forced to choose between letting the detainee die and giving in to their demands. ICE supports detainees' ability to express concerns about their cases, and an array of options – short of life-threatening hunger strikes – is available to them, including:

  i. Pursuit of applications for relief and protection from removal in proceedings before a neutral immigration judge;
  ii. Submission of facility-specific informal and formal grievances (including emergency grievance processes and appeal processes) relating to any aspect of their detention, including medical care, which trigger prompt responses;
  iii. Submission of the online ERO Contact Form on the detainees' behalf by stakeholders, including interested individuals, nongovernmental organizations, faith-based organizations, and advocacy groups;[1]
  iv. Complaints to oversight entities within the Department of Homeland Security, including the Office of Inspector General, Office for Civil Rights and Civil Liberties, Office of the Immigration Detention Ombudsman, as well as the ICE Office of Professional Responsibility; and
  v. Use of the Detention Reporting and Information Line, a toll-free service that provides a direct channel for detainees, family members, private attorneys, and other stakeholders to communicate directly with ICE ERO about detainee allegations and concerns.

h. Some detainees may merely voice threats to go on a hunger strike, diverting additional staff attention away from other detainees.

i. If a detainee is permitted to die from self-starvation, public perception of DHS and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

9. For the reasons stated above, to allow the Defendant to continue to refuse to eat and drink water would harm ICE's ability to protect detainees from self-harm and suicide, and operate the MPC in a safe, secure, and orderly manner and it will be necessary to involuntarily administer nutrients and/or fluids to him, to prevent imminent bodily harm and/or death.

[1] This form is available at: https://www.ice.gov/webform/ero-contact-form.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed March 28, 2024

JEFFERY G VANNETT

Digitally signed by JEFFERY G VANNETT
Date: 2024.03.28 14:31:16 -05'00'

Jeffery G. Vannett
Acting Assistant Field Office Director
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Houston Field Office
Montgomery Processing Center
Conroe, Texas