# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

UNITED STATES OF AMERICA

Plaintiff,

v.

UMIDJON SHUHRAT UGLI NEMATOV

Defendant

**DECLARATION OF ANA LAURA STELLA, MD.**

I, Ana Laura Stella, MD make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1. I am a licensed, Board-Certified Family Medicine physician assigned to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC) as the Clinical Director at Montgomery Processing Center (MPC). I have held this position since November of 2022 and as IHSC physician since 2020.

2. ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of those detained in its custody are among the agency's highest priorities, and IHSC has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

3. As the Clinical Director at Montgomery Processing Center, my duties include providing medical care for detainees at the facility.

4. This declaration is made in support of the petition by the Department of Homeland Security to perform involuntary vital measurements, examination, intravenous hydration, and involuntary feedings for Umidjon Nematov, A# xxx-xxx-786 who is detained at Montgomery Processing Center.

5. I am the treating physician of Mr. Nematov, and I make this declaration upon a review of his medical record and my examination and treatment of hunger strike/starvation/malnutrition.

6. Mr. Nematov is a native and citizen of Uzbekistan. He entered the Montgomery Processing Facility on March 27th, 2024.

7. On March 5, 2024, Mr. Nematov missed his ninth consecutive meal and was classified as a hunger striker pursuant to IHSC guidance. Mr. Nematov states that he is on a hunger strike for being in custody for too long. He is on day 23 of his hunger strike and has missed 77 meals. He has had periods in which he has consumed water and documentation from previous facility states he has not consumed any food or nutritional supplements since he initiated his hunger strike.

8. Mr. Nematov's current weight is unknown because he has refused to be weighed or otherwise examined by medical staff at Montgomery Processing Center. His pre-hunger strike weight was 137 pounds; however, this was documented when he entered the previous facility in August of 2023.

9. Mr. Nematov has been evaluated by a behavioral health provider upon arrival to MPC and displays no evidence of a psychiatric condition that would cause him not to eat or drink. He appears to be operating under his own free will.

10. Mr. Nematov has been counseled by medical staff, through an interpreter, on the effects of self-imposed dehydration and starvation on his body. He has also been informed of the involuntary hydration and feeding procedures that will be pursued to prevent injury and/or death to himself should he continue not to eat.

11. Mr. Nematov refuses to cooperate with our medical team and evaluation is limited due to him being non-compliant and non-cooperative with the staff.

12. He remains in custody at Montgomery Processing Center and under medical observation by medical staff in the Medical Housing Unit.

13. Mr. Nematov has refused to allow the medical staff to perform vital signs and basic physical examinations, as well as routine laboratory testing.

14. Laboratory tests are needed to evaluate the metabolic state to include electrolytes, liver, and kidney function. This was explained to Mr. Nematov, but he continues to refuse all type of medical evaluation.

15. The laboratory tests that need to be obtain during a hunger strike include:

a. Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests BUN (blood urea nitrogen) creatinine level and proteins. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium, and glucose levels.

b. Complete blood count. This test reveals the hemoglobin level.

c. Urinalysis, which reveals the presence of ketones, blood, and crystals in the urine.

d. Thiamine levels to assess deficiency at day 14 of a hunger strike.

e. Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

f. Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle

tissue that can fatally damage other vital organs.

g. Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL. When prealbumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

16. It is difficult to predict for how long the human body can survive without food; if an individual does not have adequate fat stores, this time decreases significantly. If an individual goes without water for approximately eight to ten days, he will suffer from dementia and delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

17. Mr. Nematov's condition is expected to decline as his hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. Mr. Nematov's physical gross examination is positive for weakness, body odor, halitosis, unsteady gait, lethargy and difficulty concentrating.

18. Medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

19. The medical staff has explained to Mr. Nematov the medical necessity to eat to preserve his health and the medical risks of continuing his hunger strike. Other staff members have repeatedly talked to Mr. Nematov in attempts to convince him to eat solid foods, liquid, or

bland diets, and/or drink nutritional supplements. However, Mr. Nematov has continued to refuse to eat solid food and/or drink nutritional supplements.

20. I have personally explained to Mr. Nematov my concerns regarding his condition and the medical risks involved with a continuing lack of nourishment. That is, he risks significant and ongoing metabolic changes induced by his decreased nutritional intake. If he continues his hunger strike, he will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys, liver, heart failure and the risk of death. Mr. Nematov stated to me that he would continue his hunger strike.

21. In my professional medical judgment, if Mr. Nematov continues his hunger strike, with the aggravating factor of inappropriate oral hydration, he will reach the point where he will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to his internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest. Additionally, and taking into consideration the recent COVID-19 world pandemic, his prolonged starvation will continue to weaken his immune system, further exposing him to serious, and possibly fatal consequences should he encounter an infected individual.

22. When medical intervention is required, it will be necessary to feed Mr. Nematov a nutritional supplement through a nasogastric tube and/or intravenous line to provide him the nutrition he needs. His present dehydration status may also require intravenous fluid hydration to stabilize his blood pressure and ameliorate the signs and symptoms of postural hypotension.

23. Also, it is necessary to perform laboratory tests and physical evaluation to monitor and assess his clinical condition. If his laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously.

24. Based on Mr. Nematov's current physical condition, and the fact that he has not had adequate nutritional intake for 24 days, nor had appropriate oral fluid intake, it is my informed medical opinion to a reasonable degree of medical certainty that involuntary intravenous hydration and oral feedings will be required if his laboratory, examination, and assessment show a severe state of malnourishment. His lack of nutritional intake compounded by his voluntary dehydration can drastically exacerbate the effects of his hunger strike. Involuntary hydration and feeding would be pursued only as necessary to prevent injury, further dehydration, malnourishment, organ failure, or loss of life due to his self-imposed hunger strike. Involuntary feeding would be accomplished through a nasogastric tube or intravenous (parenteral) means.

25. The issuance of a court order to perform involuntary feedings and hydration, blood draws and all necessary physical examinations is medically necessary to preserve and sustain Mr. Nematov's health, welfare, medical safety, and life.

26. To ensure the patient's health, welfare, medical safety, preservation of life, should the patient refuse to cooperate with laboratory blood draws, involuntary hydration and/or involuntary nutrition, medical soft restraints will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

I declare under penalty of perjury that the foregoing is true and correct.

**Executed March 27, 2024** ANA L STELLA

Digitally signed by ANA L STELLA
Date: 2024.03.28 15:22:56 -05'00'

**Ana Laura Stella, MD**

**Clinical Director**
**Montgomery Processing Center**